2017-2020 040-2310 25-10-2010 040-2310 040-2310 040-2310 040-2310 040-1214 040-2114  040-2114 040-2114 040-2114 040-2114 040-2114 040-2114 040-2114 040-2114 040-2114 040-2114 040-2114  040-2114 040-2114            040-2114 040-2114 040-2114 040-2114 040-2114 040-2114 040-2114 420-2320  070-3story Ramada 070-3story Ramada    070-3story Ramada            070-23story Ramada 070-3story Ramada 070-6tory Ramada 070-3story Ramada 070-3story Ramada 070-3story Ramada 070-6tory Ramada   070-23story Ramada  070-23story Ramada 070-3story Ramada 070-23story Ramada   I understand what counsel is going to argue in the point and I understand what you may be getting to and what I would say to that is that this is a covenant that runs with the land and so they have constructive notice, they have record notice of this covenant and I understand it's old but it was successor parties and when they took title to the property, this fence agreement was in their chain of title and they had notice, they had constructive notice and there's some cases in the brief that talk about this, they had constructive notice or notice to the world that they had this obligation and so I understand they didn't know about it but they should have known about it, they had constructive notice, it's in their chain of title and that imposes an obligation upon them to fix the fence. Even if they knew about it, Mr. Melton, didn't Mr. Frank start like a different tradition with respect to that contract by checking the fence himself every Sunday and yet never telling the Rosens that there was an issue? Well, I don't, I guess when you say, I would agree that it is a course of conduct that he did utilize or that he engaged in. Which was contrary to the contract, to the breach of fence agreement, correct? I don't know if it's contrary but I would say in the face of that agreement, he did go and fix the fence and if you look at his testimony, there were a couple, this area where the cows got out was admittedly problematic because it's a creek bed and it kept washing out and he admitted that it had washed out prior to this and that he went and he tried to fix it and that it was a problematic area and then he had tried to run current through there but then the cows would trip the wire and then the current would go out. So, I mean, I'm not disputing that, you know, he made these efforts but what my argument is... So, he took on the brunt of fixing that fence most often? Prior to the accident, he did act that way but I will state to the court, is subsequent to the accident, the Rosens did fix the fence and they put current in the fence. And so, obviously, why would you put current in a fence? The only reason to put current in a fence is to keep animals out. And so, and I understand that it's a subsequent measure and that it can be used for negligence but it can be used to show ownership and control. And so, if in fact this agreement does not apply and they have no obligation to fix the fence, then the question that I would pose is why are they putting current in the fence? And there's a bill, I think it's like $2,000 they paid, they hired someone to fix the fence. Why would they be paying someone to fix the fence if they have no obligation whatsoever to fix the fence? If they have no obligation to keep cattle in, why would they put current in the fence? And so, what I would submit to you is I understand that my client engaged in a course of conduct. However, what I would say to the court is I don't think that that course of conduct nullifies a covenant that is in the chain of title in the county. I don't think it nullifies that. There's nothing that's been filed in this case. There's nothing that I'm aware of, orders of court or whatnot that would essentially vacate this, nullify or otherwise extinguish this covenant. It's still on the books and they still have to comply with it. And, you know, I can't remember but I think this may have gotten like brought up to some extent between my client and the Grossman's after. And so, I don't know if that's why they went. And it's like, oh my gosh, we have an obligation to put current in the fence and, you know, now we know. But I would submit to this court that I don't feel that my client's conduct essentially cancels the agreement in connection with fence lines because it's a covenant that runs with the land. Okay. By doing that though, isn't he communicating to them that, hey, don't worry, I got this covered. You know, I'm good with fixing the fence. You guys are, you guys just be good neighbors? Well. Did they even know he was fixing the fence? Well, that's what I was going to say. My recollection is this was a vacant, so on my client's side it was a cattle pasture but on the other side I think it was just cropland. And so, they were leasing in her deposition, I think Ms. Grossman said she was leasing that to some other party, I forget who it was, but she was leasing that and that she had rarely, if ever, visited that property. And so she, I mean, obviously they would have no way of knowing, you know, they were never there, they never checked it, but I would submit to the court is, look, I understand this is old, I understand, like, the common sense arguments that the court is posing to me today, but I would, what I would submit to you is this is a powerful tool, it's a covenant that runs with the land, and they should have known about it and they should have checked and if they knew about this, they should have had, you know, I would submit it's a two-way street. They could have called my client and said, hey, you know, I've got this covenant, you know, I want to make sure that everything's okay with this fence, are you taking care of it? And I don't think that conversation ever took place. So what I would submit to the court, again, is that there's a covenant that runs with the land and under that covenant they have an obligation to fix the fence. So your negligence is the negligence on failure to comply with the fence act or breach of the fence agreement? Talk to me about your negligence. Well, what I would say is that that essentially triggers the duty. Because, I mean, you have to argue, you know, the duty. Yeah, I mean, essentially you have to argue that the duty is coming from somewhere, and so what I would argue is that that fence agreement triggers the duty. But even if you put that aside just for a moment without the fence agreement, you think about the negligence count, you know, I would argue at least to some extent that the duty comes in because of the way they acted after, which is fixing the fence and basically admitting their depositions that they had a duty to repair that portion of the fence. You know, they're essentially, in my opinion, they had admitted that there was a duty by their actions and their statements. But you could also argue that there's a duty under the fence agreement because it's imposing a duty upon them to fix the fence. And there's some cases that I cited in the brief about duty, and as this Court, I'm sure, knows the application of a duty is broad. Every person owes a duty of ordinary care to all others to guard against injuries which naturally flow as a reasonable and probable and foreseeable consequence of an act. And such a duty does not depend on contract privity, interest, or the proximity of a relationship, but extends to unknown persons, and that's the Wydowski, the Durkee Foods case. And so, I mean, really what I think is that what the negligence count comes down to is, like any negligence case, is it foreseeable. And what I would say is they had a duty to fix this fence under the fence agreement, and based on their understanding of, you know, essentially, I hate to say this, but what our old school farmer rules is that when you stand in the middle of the fence, she's talking about this in her deposition, is when you stand in the middle of the fence and you look at the fence and if you're on your property facing the fence, you fix everything to the right. And I think that's what her, like, understanding of this was, and that's why she's saying that that goes back probably to the 1800s. And so based on that and her understanding, you know, I think it was foreseeable that if they didn't fix the fence that the cow would get out. And also, you know, if they would have went there and they would have looked, based on what my client was saying, this area where the cow got out over the creek bed was obviously problematic. And so if they would have went there and looked and saw the creek bed and the fence going over the creek bed, you know, they may have been able to ascertain that this is a problematic area that, you know, we have responsibility to fix and it's foreseeable that if we don't fix this fence that a cow could get out. I mean, cows out in this neck of the woods are not uncommon. It's not an uncommon problem, and that's why, frankly, he was riding the fence. When I say riding, he was riding the fence on the ATV. That's why he was doing that, to try to keep the cows from getting out, but it's not foolproof. I mean, like what he said, what he thought happened is that a deer or some animal hit his hot layer because he had a hot layer kind of going in front of it, in front of the creek bed, so the cows would hit it, is that a deer or something hit the hot layer and the hot layer went out. But, you know, what I would say to the court is that it's like any negligence case, is that if you look at the foreseeability factor, it was foreseeable for the Grosens that this would happen based on their obligations under the fence agreement and based on the way they acted after. If truly they had no duty to fix this fence, then why are they fixing it after? Why are they putting current in it, and why are they admitting that they're responsible for repairing that portion of the fence? And so, really what I think the negligence count comes down to is foreseeability. I would like to talk, while we're talking about the negligence count, I would like to talk about the domestic animals running at large act. Counsel, and basically I think counsel's logic and the logic of the trial court were the same on the motion for summary judgment, which was essentially that the domestic animals running at large act is a bar to the contribution action on the negligence count. And what the rationale for that is, is that under the domestic animals running at large act, a owner or keeper of an animal is the only party that can have liability under the domestic animals running at large act. There is no liability for non-owners and non-keepers. And I don't dispute the fact that Grosin is not an owner or not a keeper of the animal my client owned it. And so what I think the trial court and counsel are saying is that because Grosin is not an owner or keeper, it would be an impossibility or a bar, whatever word you want to use, for Grosin to have liability under the domestic animals running at large act. And obviously I don't agree with that. If you look at work, the city of Highland Park, there are several cases that are cited in the brief and they essentially talk about when there is a statutory bar of a first party claim against the plaintiff and the defendant, that that bar does not necessarily translate into the third party claim. So in other words, that the bar under the city of Highland Park does not apply to the contribution action because it's a contribution action that only applies to a first party claim. Thank you. Thank you. Good morning, Your Honor. Good morning. Counsel, may it please the court. My name is Stephanie Fugger and I represent the Grosins, the third party defendants and the appellees in this matter. The third party complaint that was brought against the Grosins is a contribution action. So in order for my clients to be held liable, there needs to be some way to subject them to liability in tort. The trial court correctly found that there was no basis upon which Frank could assert that they were liable in tort. And I'll talk about each of the three theories that he tried to bring in the amended complaint, each of which the trial court correctly found were failed as a matter of law. The first one is the common law negligence claim that he made. And if you actually look at the specifications of negligence, one of the things that he says in the common law negligence claim is that the Grosins should have known that the fence was not sufficient to keep cattle in. And that is why in my brief I had talked about the fact that though he's calling it a common law negligence claim, what he's actually talking about is a violation of the Domestic Animals Running at Large Act because the only way for someone to bring about a claim related to injury or damages in the state of Illinois for a cow getting out is under the Domestic Animals Running at Large Act. There is no common law duty for Frank or the Grosins to keep cattle enclosed except under the Domestic Animals Running at Large Act. So that's where our argument is that as it's undisputed that the Grosins are not owners or keepers of cattle. So a claim cannot be brought against them arising out of common law negligence or under the Domestic Animals Running at Large Act, however it's captioned, for their failure to keep cattle in because they aren't an owner or keeper. They don't have that duty. This was under – he's looking for this under contribution, right? Correct. So isn't that an equitable doctrine? It is an equitable doctrine. However, it's not a heightened – it's not a claim where you get to ignore the elements of the underlying claim. He still has to be able to show that the Grosins are liable to the plaintiff, and he can't do that under the Domestic Animals Running at Large Act or under common law theory because there's no duty on the part of the Grosins or anyone to keep cattle enclosed under the common law. How about under that breach of the fence agreement? The breach of the fence agreement, that particular agreement provides for an agreement between two landowners to maintain equal shares of certain division fences. It doesn't provide for any remedies. It doesn't provide for any liquidated damages or any damage provisions. So if Frank believed that the Grosins were violating their obligation under that contract, what he certainly could have done is brought a breach of contract claim. However, he has to show how the breach of that contract creates tort liability as between the plaintiff and the third-party defendants, and it just isn't there. Well, it doesn't – wouldn't he have an opportunity to do that if he got past someone in judgment? Well, as a matter of law, he has to explain how the plaintiff or similarly situated plaintiffs are owed a duty pursuant to the terms of that. And the trial court correctly found that as a matter of law, there was no duty owed. There's no relationship. The plaintiff was an intended beneficiary of that. If that is what the – if Frank's position, as I understand it from his brief, is that the public policy considerations are such that we should find that there's a duty for the plaintiff and the general public at large that because of this contract that was entered into back in the 70s, my clients had an obligation then to protect the general public and the plaintiff from cows escaping on the road, then we're really changing the scope of the interplay between the Fence Law Act, the domestic animals running at large act, and the negligence laws of this state beyond recognition. That would mean that every single person who ever happened to be driving down that road is owed a duty pursuant to that contract, which is just not what the parties intended. And there's no evidence of that by the actual terms of the contract to suggest that that's what they intended. So it only relates to each other, the two parties to the – I'm sorry. So you're saying it only relates to the two parties to the agreement. Correct. Correct. That it was just because under the Fence Law Act, adjoining landowners who share a boundary fence are required to maintain their fences in just proportion, which doesn't necessarily mean 50-50. So under this contract that was written between these predecessor parties in the 1970s, it was their intent to define what was meant by just proportion. They did in this contract determine it to be 50-50, but they could have done 30-70 or whatever. So really the purpose of that contract was to define as between these parties what their obligations were with regard to a number of division fences. The other thing I think is very important, that Count 2 of the amended complaint that Frank filed against the Grossens relates to violations of the Illinois Fence Law Act. Now, the Illinois Fence Law Act is a statutory framework to resolve disputes among adjoining landowners as to the maintenance of boundary fences. And it requires certain things if one is going to avail himself of the provisions of the Act. So if Frank believed that the Grossens were not meeting their obligation or duty to be maintaining the fence, what he could have done is follow the statutory guidelines. He could have provided notice to the Grossens, and then if they still elected not to fix or maintain their fence, he could have made those repairs themselves and charged those to the Grossens. He didn't do that. Another option would be for him to call out the county fence viewers, have them come and make a determination about whose responsibility it was to maintain the fence, and that can be enforced in court. He elected to do none of those things. And I think the undisputed facts are very important here. Frank, and this is found at the record, C-168 and C-169. This is from Frank's deposition. He testified that he knew the Grossens, he knew where they lived, he knew that they did not live on this adjoining parcel, it's just an agricultural parcel that they owned. He testified, as Your Honor pointed out, he would travel all around the property on Sundays to inspect those fences, and he made the conscious decision for each of the three years prior to this accident not only to make his own changes to that fence, but not to call the Grossens because he wanted to be in charge of how those changes and repairs were taking place. So he never gave them an opportunity to fix. Correct. Correct. And so he cannot turn around and then say, okay, well, now that there's been an accident, I'm going to push some of the damages that I had to pay in a settlement to the plaintiff over to the Grossens when he didn't do what the prerequisites under the statute were. And there's a couple of instructive cases. One is the Fox v. Ferneyhoe case, which is a 4th District case. That involved a defendant who turned cows out into a cattle enclosure knowing that his enjoining landowner's fence was not sufficient to keep his cattle in. And when his cattle foreseeably got through the fence and died eating his neighbor's cattle, the court said when he tried to file a claim against his neighbor for not keeping up his portion of the fence, the court said, no, you had remedies available to you under the Fence Law Act. You chose not to avail yourself of them so you cannot come in here and then try to recover for damages when you didn't do what you should have done under the Act. I think that's the same situation that we have here, and the trial court correctly found that Frank was barred from using the Fence Law Act because of the undisputed facts that he didn't avail himself of the prerequisites under that Act. I also wanted to mention the McKee v. Tristler case. It's an old case, a 1924 case that was cited by Frank in one of his briefs. I think that Frank misstates the holdings slightly in that case. That case, he cites it for the proposition that the owner of cattle is relieved of his duty to restrain the cattle as to the portion of the fence that's required to be maintained by an enjoining landowner pursuant to the Fence Law Act. What McKee doesn't, McKee doesn't say that at all because there's no indication that there's ever an aggregation of a cattle owner's duty to keep the cattle restrained pursuant to the Animals Running Act. What the McKee case stands for is that if I, as an enjoining landowner, if my cattle or my property are somehow damaged by my neighbor's cattle coming through the fence, then before I can bring a claim, I've got to make sure that my portion of the fence is sufficient. That's what the McKee case stands for. The case also says that you're expected to contact, basically sets up that you're expected to contact the owner of the owner to advise him and give him the opportunity. Correct, the notice provisions under the Fence Law Act. Yes. So for those reasons, again, we believe the trial court correctly found that the Illinois Fence Law Act is not a basis to subject my clients, the grossons, to liability such that would support a contribution claim. The third way that Frank tries in his amended complaint to show that the grossons are subject to liability is, again, through that agreement in connection with line fences. And Frank argues that this contract, again, creates a duty not just to the plaintiff but to the general public to create and maintain fences, to keep his own cows enclosed. One of the things that he said in his reply brief, the public policy considerations of the Domestic Animals Running at Large Act are outweighed by public policy considerations supporting contribution. So Frank is really asking this court to change what the status of existing law is and to create a duty that the grossons or similarly situated individuals would have to fence to keep in their neighbor's cattle. I mean, the ramifications and consequences of that kind of a duty are just astronomical in rural areas in this state. Anyone who has land near somebody else that has cattle and has fences is under an obligation then to make sure that those fences are sufficient to keep out cattle that they don't even own. There just isn't a duty at common law or under any of the statutory schemes, the Illinois Fence Law Act or the Domestic Animals Running Act, that would support that interpretation of the duty at law. In the Worth case, or the Simpkins case it might be, that was cited by the appellant in his brief, when we're looking at whether a duty exists, and again, this is not a duty between the third-party plaintiff and the third-party defendant. We're talking about a duty between the plaintiff in this lawsuit and the third-party defendant because in order for there to be a contribution claim, both of them must be subject to liability to the plaintiff. And so it's not our position that Frank might not have had a breach of contract action or an ability at some point to have brought a claim against the grossons pursuant to the Illinois Fence Law Act. But when we look at whether there is a duty owed to the plaintiff, we should look at the four different factors to talk about the relationship. The foreseeability of injury. Now, counsel talked about, well, it's foreseeable if you don't maintain a fence that a cow could get out. Well, that's a little bit more of a generic way of talking about what happened here. Is it foreseeable to my clients that maintaining the fence or not maintaining the fence would lead to a six-figure settlement from some random third party that happened to be driving down the road that they would have to contribute to a settlement? I don't think that's foreseeable in the way that the case law contemplates. And then we also look to the consequences of imposing this burden on the grossons. And again, this is just an astronomical departure from negligence law to place this burden on anyone who lives near somebody that owns cattle. That's why the Domestic Animals Running at Large Act was enacted, to create the duty on the part of people who own or keep cattle to keep them enclosed because they're in the best position to know where their cattle are, where the fences are, and what the condition of the fences are. And there's a really simple fix to this. When counsel talks about unjust enrichment, I don't see this as a case of unjust enrichment because Frank was the one who was in the best position to be able to avoid this result by simply, in the three years prior, knowing each time that this fence potentially was getting washed out, he could have elected at any of those times to talk to the grossons about... You're not saying that there's never an opportunity for contribution under the Fence Act, are you? No, no. But under these undisputed facts, there just isn't because of the fact that Frank, it's undisputed that he failed to contact them. And not just that he failed, he testified that he made a conscious decision not to because he was taking care of it. He himself, a farmer with 40 years of experience dealing with fences, decided that he was handling it sufficiently and that he didn't need the grossons to do anything. So then how do we get around that contract, that fence agreement? Well, again, I think we're not saying that there isn't a potential breach of contract, but it doesn't create tort liability for a contribution claim. He can bring a breach of contract claim, then the court could be considering or a jury could be considering what are his damages. And at that point, I mean... Wasn't that a breach of contract claim? What? A breach of the fence agreement. Isn't that a breach of contract claim? Well, when he provided the grossons with notice that he believed for the first time that the fence was insufficient, they immediately fixed it. They immediately hired someone to make the repairs at his request. So I don't, I mean, I guess it would be for a jury to decide whether there is a breach of contract. Yeah, that's right. So that's the whole reason why we're here, isn't it? Well, but not as part of the contribution claim, because whether a breach of contract exists between the Franks or Mr. Frank and the grossons is a breach of contract action. There's still been no evidence or facts that demonstrate that that contract subjects the grossons to tort liability to the plaintiff, Kirk Rabb, who was just someone that happened to be driving down and got in a collision with Frank's cows. But if the cows, if the fence were fixed pursuant to the fence agreement, the cow wouldn't have gotten out and there wouldn't have been... It's like Mrs. O'Leary's cow. Really, right? The poor people are being tied. Chicago fire. The contribution only applies to tort, though, right? Correct. There has to be a finding that both the grossons and the Frank are subject in liability in tort to the plaintiff. In tort. Right. So this is all brought in the context of a tort claim. Correct. And so, again... And so a breach of contract would be a separate complaint that he would have to file. Correct. Unless there are other questions, I will conclude by asking that you affirm the decision of the trial court. Thank you. Did you wish to reply? Yes. Thank you. The fence agreement says, this agreement shall be binding upon the parties here to their heirs, executors, administrators, and assigns. That is an agreement that runs with the land. The trial court, during the first summary judgment, counsel had argued that this agreement did not run with the land, and the trial court disagreed with counsel and found that it did run with the land. Even if it runs with the land, it's a breach of contract, correct? Correct. Did you file it as a breach of contract? No, I did not file a breach of contract suit. I filed a contribution action for breach of the fence agreement. But is that a tort? Well, okay, I would argue a breach of contract is not a tort. I think that's obvious. No, but the Contribution Act doesn't apply to a breach of contract, does it? Well, if you look at Cirillo's v. Gleason, 154.03.494, the court in that case found that a duty can sound in tort or subject a party to liability in tort that arises from a contract. So basically, in that case is what they had said. It's in the brief. In that case, it's exactly on point. In that case, the court found that the defendant and the third-party defendant sued by the plaintiff were subject to liability in tort to the plaintiff because they had contracts with the plaintiff. And so even though they had contracts, the court found that there was still contribution in that case because they were subject to liability in tort. I'm sorry, give me the name of the case. It's Cirillo's, C-I-R-I-L-O-S-V, Gleason. And it's at 154.03.494. I believe it's a First District case. Thank you. And it's in the brief probably more than once. And in what they said in that case, and so what I would say to this panel is that subject to liability in tort is different than the claim being grounded in tort. You just have to be subject to liability in tort until we get back to the duty and the foreseeability. And I submit to you that under this fence, that under this agreement that runs with the land, that they are, if you look at the Cirillo's case, that this is the same thing as creating a duty to fix the fence. Even though it is a contract claim, it subjects them to liability in tort. So no, the tort and the contracts, they are different theories, but for contribution, you can still base it on a contract under the Cirillo's case. The only difference between this case and the Cirillo's case is that in Cirillo's the contract was between the third-party defendant and the plaintiff, and here the contract is between the two joint tortfeasors. And I would submit to the court that that difference does not matter because there's still a contractual obligation that is creating a duty, and the duty essentially subjects the grossons to liability in tort. There is their foreseeability. You submit their foreseeability. Yes. I mean, obviously I heard what counsel was saying, and I think what she is saying is that she's creating a new standard for foreseeability. You don't have to foresee that it would result in some serious injury or some multimillion-dollar settlement. You just have to foresee that the cow would get out and that it would cause an injury. And they should have foreseen that under this agreement that one's with the land. And I just wanted to back up and say one thing before my time runs out, and that is that the parties in this agreement did not intend for this agreement to just be between these parties. They intended it to run with the land. It says, shall be binding upon the parties hereto their heirs, executors, and ministers, and assigned. So it was not intended just to be between the two of them and then end. If that's the case, they would have terminated, and they would not have – it wouldn't be lodged in the chain of title. I don't know that she is saying that they don't agree that it ran with the land. I think the issue is that your client took kind of a different approach to that agreement in the past three, four years, kind of took it upon himself to do the repairs and never notify anybody else. Okay. And this is sort of where we started. But what you're saying is it doesn't really matter because you have this agreement and they're bound by the agreement. Right. It doesn't matter. They're bound by the agreement. The agreement runs with the land. I hate to say it, but it's kind of tough luck. I mean, I understand that he was fixing the fence and he was engaging in those actions, but regardless, those actions did not nullify or terminate this, and there's no case law in the brief that says that. So in ending, I would just ask that this Court, on all three counts, reverse the grant of summary judgment on each of the accounts and find in favor of the appellant. Thank you. All right. Thank you very much. Great arguments on both sides. We will be in recess until the final argument.